**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:**<br><br>**INNOVATE LABS LLC,**[1]<br><br>Debtor. | Chapter 7<br><br>Case No. 24-12283 (JKS) |
| **ALFRED T. GIULIANO, as Chapter 7 Trustee of the Estate of Innovate Labs LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**ADAM FISK; BRAVE NEW SOFTWARE PROJECT, INC.; RACHEL FISK a/k/a RACHEL JOHNSON; MARY HAYES a/k/a MARY TILLER; ONESHIN AIKEN; DEREK FRECH; PERCY WEGMANN; FUNDACIÓN APAMANTE a/k/a APAMANTE FOUNDATION**<br><br>Defendants. | Adv. Proc. No. 26-_____ (JKS)<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

## I. INTRODUCTION

1. Plaintiff Alfred T. Giuliano, the Chapter 7 Trustee (the "Trustee") of the estate of Debtor Innovate Labs LLC ("Innovate" or the "Debtor"), by and through his undersigned counsel, brings this action, *inter alia*: (a) to avoid as fraudulent transfers, preferential transfers, and/or unauthorized post-petition transfers the series of transactions by which the Debtor's controlling manager, Defendant Adam Fisk, moved the Debtor's only operating business — the "Lantern" internet-censorship-circumvention platform, its paid "Lantern Pro" subscription product, its workforce, its government funding, its website, its app-store accounts, its user-base, and its

[1] The last 4 numbers of the Debtor's Federal EIN are 6857.

goodwill — out of the Debtor and into Defendant Brave New Software Project, Inc. ("BNS"), a non-profit corporation that Fisk founded, presides over, and controls; (b) to recover the value of that business, and the revenue it has generated and continues to generate, from BNS, Fisk, and the other Debtor insiders who orchestrated, implemented, and profited from the wrongdoing alleged herein; (c) to hold Fisk and the other fiduciary Defendants liable for breaching the duties of loyalty, care, and good faith that they owed to the Debtor; and (d) to hold BNS and the remaining Defendants liable for knowingly aiding and abetting those breaches and for their unjust enrichment at the Debtor's expense. In short, the Debtor was stripped of its business and then placed into Chapter 7 as an empty shell.

2. In 2019, BNS sold the Lantern business to Innovate under a written Asset Purchase Agreement that warranted that Innovate would own the "Lantern" trademark, the lantern.io and getlantern.org domains, every server and cloud account, the getlantern GitHub organization, and "[a]ll data resulting from the use of Lantern … including … data from individual end users," and covenanted that BNS "shall have no right to use (and shall not use) or receive the benefit of the Purchased Assets."

3. Five years later, and in the weeks immediately before Fisk signed the Debtor's Chapter 7 petition, those same assets were quietly re-registered, re-listed, and re-billed in the name of BNS. No consideration for any of it is reflected in the Debtor's books and records; upon information and belief, BNS paid nothing.

4. The Debtor's schedules, signed by Fisk under penalty of perjury, do not mention BNS at all, list no transfers outside the ordinary course, and list no interest in any other entity.

5. Today BNS, under Fisk's leadership, markets, sells, and collects the revenue from "Lantern Pro" to the same users, through the same website and the same app-store listings, that belonged to the Debtor on the Petition Date.

6. The conduct alleged herein is not the product of arm's-length dealing. It was carried out by a single individual, Fisk, who sat on both sides of every transaction: as the Debtor's Chief Executive Officer, sole remaining "Founder Manager," and 47.67% member, and simultaneously as BNS's founder, President, and Executive Director. The two entities shared one workforce, one Chief Financial Officer, one set of servers, one product, one mailbox address, and one decision-maker. As Fisk himself put it in a 2023 written statement, BNS, "which has no employees, would 'lease' time from the members/employees/contractors of Innovate," and "[i]n general, BNS bears most of the costs of operations with Innovate receiving more of the benefit of this cost-sharing arrangement."

7. By 2025, the arrangement had been inverted entirely: BNS had eleven employees, including, upon information and belief, personnel formerly paid by the Debtor; BNS was booking $627,931 of "Subscription income," a line item that had first appeared in its tax returns and audited statements in 2024; and the Debtor, according to BNS's own tax return, had "ceased ops in 24."

8. The Trustee seeks to avoid and recover the transfers by which the Debtor was stripped of its business; to recover damages from the Defendants in an amount to be proven at trial but which the Trustee believes substantially exceeds $20,000,000; to impose a constructive trust upon and compel turnover of the Lantern business and its proceeds which rightfully belong to the Debtor; to equitably subordinate and disallow the claims filed against the estate by the insider Defendants; and to obtain such other relief as is just and proper.

## II. JURISDICTION, VENUE, AND STATEMENT UNDER RULE 7008

9. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b), because this proceeding arises under Title 11 of the United States Code (the "Bankruptcy Code"), and arises in and is related to the Chapter 7 case captioned *In re Innovate Labs LLC*, Case No. 24-12283 (JKS) (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and pursuant to the Amended Standing Order of Reference of the United States District Court for the District of Delaware dated February 29, 2012.

10. The Trustee demands a jury trial before an Article III judge on all claims so triable under the Constitution and applicable law.

11. Pursuant to Federal Rule of Bankruptcy Procedure 7008 and Local Rule 7008-1, the Trustee states that he does not consent to the entry of final orders or judgment by the Bankruptcy Court as to jury-triable claims and expressly reserves the right to move to withdraw the reference pursuant to 28 U.S.C. § 157(d) as to any claim triable to a jury.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a) because this proceeding arises under, arises in, and is related to the Bankruptcy Case, which is pending in this District.

## III. PARTIES

**Plaintiff**

13. Plaintiff Alfred T. Giuliano is the duly-appointed and acting Chapter 7 Trustee of the Debtor's bankruptcy estate.

14. On October 8, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court. On October 9, 2024,

Plaintiff was appointed Chapter 7 Trustee of the Debtor's estate and continues to serve in that capacity.

15. The Debtor, Innovate Labs LLC, is a Delaware limited liability company. At all times material hereto the Debtor was governed by a written limited liability company agreement, most recently the Second Amended and Restated Limited Liability Company Agreement of Innovate Labs LLC effective as of January 31, 2020 (as amended, the "LLC Agreement"), which is governed by Delaware law. The Debtor's principal place of business was in Los Angeles County, California from 2015 through June 2024. The address listed on the Debtor's petition, 4845 Pearl East Circle, Suite 118, PMB 318052, Boulder, Colorado 80301, is a private mailbox. It is the same Boulder mailbox address (4845 Pearl East Circle, Suite 118) that BNS lists as its own principal office on its Forms 990 for tax years 2024 and 2025 and on its Google Play developer listing, and that BNS identifies, with the identical box number 318052, in its published Terms of Service and Privacy Policy for the Lantern product.

**Defendants**

**The Director and Officer Defendants**

16. Defendant Adam Fisk ("Fisk") is an individual who, according to the proof of claim he filed in the Bankruptcy Case, receives mail at 1887 Whitney Mesa Drive, #7974, Henderson, Nevada 89014. Upon information and belief, Fisk managed the Debtor and BNS from Los Angeles County, California, during most of the period relevant hereto. At all times material hereto, Fisk was a co-founder of the Debtor; the holder (directly or beneficially) of 4,000,000 Common Units, which the Debtor's petition describes as a 47.67% equity interest; a "Founder," "Founder Manager," and member of the Debtor's Board of Managers (the "Board"); the Debtor's President

and Secretary under the LLC Agreement; and, from no later than December 2023, the Debtor's self-designated "Chief Executive Officer."

17. Fisk signed the Debtor's Chapter 7 petition, schedules, and statement of financial affairs as "CEO and Director," and the verification of its creditor matrix as "Chief Executive Officer," under penalty of perjury, and signed, as the sole signatory, the October 7, 2024 "Unanimous Written Consent of the Board of Managers" authorizing the filing.

18. Simultaneously, and at all times material hereto, Fisk was the founder, President, and Executive Director of BNS and a member of its board of directors, and was, in the words of BNS's audited financial statements, the "President of the Organization."

19. Fisk is an "insider" of the Debtor within the meaning of 11 U.S.C. § 101(31) and 6 Del. C. § 1301(7), and an "affiliate" and "person in control" of both the Debtor and BNS.

20. Defendant Rachel Fisk, also known as Rachel Johnson ("Rachel Fisk"), is an individual who, upon information and belief, resides with her husband, Defendant Adam Fisk. Upon information and belief, beginning in or after July 2022 and no later than mid-2023, Rachel Fisk was placed on the Debtor's payroll and given the title of Director of Operations (or "head of operations") of the Lantern business. According to Fisk's own written statement in 2023, "[a]lthough Ms. Johnson is on Innovate's payroll, the vast majority of her work is for BNS." Rachel Fisk is a "relative" of an insider and is herself an insider of the Debtor within the meaning of 11 U.S.C. § 101(31) and (45).

21. Defendant Mary Hayes, also known as Mary Tiller ("Hayes"), is an individual and a licensed certified public accountant who, according to the Debtor's Statement of Financial Affairs, resides or maintains an office at 64 Mountain Road, South Berwick, Maine 03908. From July 2015 through at least December 2023, Hayes served as the Debtor's bookkeeper and de facto

Chief Financial Officer and, according to the Debtor's Statement of Financial Affairs, was in possession of the Debtor's books and records on the Petition Date. During the same period, Hayes simultaneously served as BNS's bookkeeper, books-and-records custodian (as reported on BNS's Forms 990 for 2022 and 2023), and, according to Adam Fisk, "the neutral representative for Innovate agreed-to by the Founders." The April 12, 2023 Side Letter Agreement between Fisk and Donnelly described below had designated "Mary Tiller" as "the representative for the Company in the engagement with Marcum" and as Marcum's "primary contact for questions, process, and substantive information regarding the Company's performance and financial information." Hayes personally performed the monthly allocations of wages, guaranteed payments, benefits, payroll taxes, and server and other costs between the Debtor and BNS that are described below. Hayes was an officer, managing agent, and/or person in control of the Debtor's financial affairs and is an insider of the Debtor within the meaning of 11 U.S.C. § 101(31)(B) and (F).

22. Defendant Oneshin Aiken ("Aiken") is an individual whose address is presently unknown to the Trustee. By the December 2023 Consent described below, Aiken was elected a Manager of the Debtor, and the Debtor's Statement of Financial Affairs, signed by Fisk, lists Aiken, in response to Question 29, as a "Director" of the Debtor from "2023" to "2024" who purportedly no longer held that position on the Petition Date; no resignation or removal of Aiken is reflected in the Debtor's records. Upon information and belief, Aiken was a Manager of the Debtor at the time of the BNS Transfers alleged herein, and he is an insider of the Debtor within the meaning of 11 U.S.C. § 101(31).

23. Defendants Adam Fisk, Rachel Fisk, Aiken, and Hayes are referred to collectively herein as the "Director and Officer Defendants."

**The Transferee Defendant**

24. Defendant BNS is a non-profit corporation, recognized by the Internal Revenue Service as exempt under Section 501(c)(3) of the Internal Revenue Code. BNS's audited financial statements state BNS "was incorporated in Delaware in 2010 as a nonprofit corporation," and the 2019 Asset Purchase Agreement described below identifies BNS as "a Delaware corporation." BNS's Forms 990 alternatively report its state of legal domicile as California (2022–2024) and Colorado (2025). At all times material hereto BNS was founded, presided over, and controlled by Adam Fisk; its board consisted of Fisk and, from 2023 forward, three other directors (five in 2022), each of whom, according to BNS's Forms 990, devoted 0.25 hours per week to BNS. In his 2023 written statement to the Debtor's valuation firm, by contrast, Fisk described BNS as "overseen by an independent board of directors that consists of Mr. Fisk and two disinterested directors." BNS is an "affiliate" and "insider" of the Debtor within the meaning of 11 U.S.C. § 101(2) and (31) and 6 Del. C. § 1301(1) and (7), and is the initial transferee of the transfers alleged herein or the entity for whose benefit they were made.

**The Insider Participant Defendants**

25. Defendant Derek Frech ("Frech") is an individual who, according to the proof of claim he filed in the Bankruptcy Case, resides at 533 Seville Street, Philadelphia, Pennsylvania 19128. At all times material hereto, Frech was a member of the Debtor holding 300,000 Profit Interest Units (approximately 3.57% of the Debtor's equity as reported in Debtor's bankruptcy petition). Frech was a signatory to the December 2023 member consent that removed Niall Donnelly as a Founder Manager (described further herein), a recipient of $19,750 in payments from the Debtor between July 1 and August 30, 2024, within one year before the Petition Date, and, upon information and belief, a "senior Innovate Partner" who participated in the planning of

new entities and alternative banking channels described below. Upon information and belief, Frech is the "D F" reported on BNS's Form 990 as BNS's "Dir[ector] of Product Design," who in 2024 was paid $99,791 by BNS and $48,959 by the Debtor, and in 2025 was paid $152,625 by BNS and nothing by the Debtor; and is the "Derek from Lantern" who, in July 2025, solicited beta testers for BNS's new "Lantern VPN" from the getlantern.org domain that belongs to the Debtor's bankruptcy estate. Frech is an insider of the Debtor within the meaning of 11 U.S.C. § 101(31).

26. Defendant Percy Wegmann ("Wegmann") is an individual who, according to the Debtor's 2020 Unit Register, resides in Austin, Texas. Wegmann was a member of the Debtor from 2016 through 2023 holding 300,000 Profit Interest Units, and, upon information and belief, is the "P W" reported on BNS's 2023 Form 990 as BNS's "CTO," who in 2023 was paid $104,494 by BNS and $45,522 by the Debtor. Upon information and belief, Wegmann was the senior engineer principally responsible for the Lantern code base and for the migration of the Debtor's technical infrastructure, accounts, and personnel to BNS. Frech and Wegmann are referred to collectively herein as the "Insider Participant Defendants."

**The Nominal Defendants**

27. Defendant Fundación Apamante, also known as Apamante Foundation ("Apamante"), is, according to the Debtor's own books and records, "a Panama Foundation which is 100% controlled by Innovate, and therefore, consolidated for tax and book purposes," whose expenses the Debtor recorded and paid in 2021 and 2022 and which those records describe as "related to Yinbi," the Debtor's cryptocurrency token. Fisk himself described Apamante to the Debtor's valuation firm in 2023 as "a Panama trust that held a crypto token" that Innovate created in 2020. Apamante is not disclosed anywhere in the Debtor's petition, schedules, or Statement of Financial Affairs, and the Debtor answered "No" to Statement of Financial Affairs Question 31

(membership in any consolidated group for tax purposes). Upon information and belief, Apamante holds Yinbi tokens, other cryptocurrency, and other assets for the benefit of the Debtor. Apamante is named herein as a nominal defendant and as a holder of property of the estate.

## IV. FACTS

**BNS, the Debtor, and the Lantern Business**

28. Lantern is a software tool that allows internet users in censored countries, principally China, Iran, and Russia, to circumvent government censorship and reach the open internet. Lantern was originally developed by Adam Fisk, who founded BNS in 2010 as a non-profit vehicle to develop open-source circumvention software with funding from the U.S. Department of State and, later, the Open Technology Fund ("OTF"). Upon information and belief, under four awards made between 2011 and 2019, BNS was awarded at least $8,533,306 in State Department and USAID grants for the development of Lantern.

29. In February 2015, Adam Fisk recruited Niall Donnelly ("Donnelly"), an experienced entrepreneur, to serve as Chief Executive Officer of BNS and, with Fisk, to build a for-profit business around Lantern. According to Fisk, "BNS, as a nonprofit, was not interested in a monetized product. However, BNS … supported Mr. Fisk's decision to work with Mr. Donnelly to form Innovate." The Debtor was formed on July 28, 2015, with Adam Fisk and Donnelly as its two founding members, each holding a 50% interest. Under the Debtor's 2017 and 2020 operating agreements, Donnelly served as the Debtor's Chief Executive Officer and Fisk served as its President and Secretary. The Debtor was seeded with a $900,000 grant from OTF, which was used primarily to build the Android version of Lantern Pro.

30. The Debtor developed, owned, and sold "Lantern Pro," a paid, closed-source version of Lantern offering premium data centers, unlimited bandwidth, no advertisements, no

data caps, and use on multiple devices. Lantern Pro was sold by subscription, principally to users in China and, to a lesser extent, Russia, through Alipay, WeChat Pay, app stores, and other payment channels. The Debtor also developed and owned a Chinese registration of the Lantern logo (PRC Reg. No. 24441114, Class 9, registered May 28, 2018 in the name of Innovate Labs LLC), the Yinbi cryptocurrency token and related Yinshi exchange, the Lantern Chat messaging product, and other technology, and was described in its own technical documentation as "the operator of Lantern."

31. The Lantern Pro business was highly successful. The Debtor's subscription revenue was $7,440,590 in 2018 and $7,683,460 in 2019, and the Debtor's books reflect cumulative subscription revenue of more than $27,400,000 from 2018 through the first quarter of 2023. At its peak, according to the Debtor's internal analysis, "Lantern was bringing in $30,000 per day in revenue." In 2018 and 2019 alone, the Debtor paid Fisk and Donnelly "Contractual Management Fee" bonuses "calculated based on net profits" of $2,588,470 and $971,120, respectively, and, in what its bookkeeper described as "prior years of plenty," donated $1,803,396 in cash to BNS between 2018 and 2022 "both to support the nonprofit and to get some tax deductions."

32. The Debtor also obtained government grants: between 2020 and March 31, 2023, the Debtor recorded $6,279,123 of grant revenue, including $3,209,829 from two OTF awards and $2,469,293 from the State Department's Bureau of Democracy, Human Rights and Labor. These grants were obtained in the Debtor's name.

33. According to internal Lantern metrics circulated in a Slack workspace used by the Debtor's and BNS's shared personnel, Lantern had more than 16,000,000 thirty-day active users in late 2022, of whom more than 12,000,000 were in Iran; recruiting materials published on lantern.io in or about 2024 described "over 12 million monthly active users."

**The 2019 Asset Purchase Agreement: BNS Sells the Lantern Business to the Debtor**

34. On March 12, 2019, BNS, as seller, and the Debtor, as buyer, entered into a written Asset Purchase Agreement (the "APA") and a companion Intellectual Property Assignment Agreement (the "IP Assignment" and, together with the APA, the "2019 Agreements"). Fisk signed both agreements on behalf of BNS as its President; Donnelly signed on behalf of the Debtor as its Chief Executive Officer. The APA was negotiated on the Debtor's behalf by Cooley LLP. The APA is governed by California law; the IP Assignment is governed by Delaware law.

35. Under Section 1.1 of the APA, BNS sold and assigned to the Debtor "all right, title and interest of BNS in and to all tangible and intangible assets of BNS related to the business of operating the Lantern application," including, per Exhibit B thereto (the "Purchased Assets"):

(a) the trademark "Lantern";

(b) the domain names getlantern.org, getlantern.com, getiantem.org, getlantem.org, lantern.io, firetweet.io, flashlightproxy.com, flashlightproxy.org, lantern.network, and natty.io, and the @getlantern Twitter handle;

(c) "All accounts on Amazon, Digital Ocean, Vultr, Azure, Microsoft, IBM, Google, and any other server providers";

(d) "The organizational GitHub account at https://github.com/getlantern";

(e) the software in the config-server, lantern_aws, and support repositories;

(f) "All data resulting from the use of Lantern or its components, including without limitation data from individual end users, and aggregate usage data" (the "End User Data"); and

(g) "All other Intellectual Property of BNS used in the delivery of the Lantern mobile app and UI," together with all associated goodwill, all rights to sue for infringement, and all accounts receivable with respect to Lantern.

36. BNS excluded from the sale only "the copyright in the software programs that BNS has released under open source licenses" listed on Exhibit D to the APA. Exhibit E to the APA, by contrast, listed forty-seven repositories of "Innovate Labs Proprietary Code" as to which BNS represented and warranted that it "has no rights in or to," including the core Lantern client ("flashlight"), the Lantern Pro server and client code ("pro-server," "pro-server-client," "lantern-pro-js-client"), the authentication and reseller systems ("auth," "resellers-server"), the iOS and desktop applications ("lantern-ios," "lantern-desktop-ui"), and the Yinbi repositories ("yinbi," "yinbi-server," "yinbi-web") (collectively, the "Proprietary Code"). BNS further represented that it had "good, sole, entire and valid title" to the Purchased Assets and that, other than the Purchased Assets and the open-source code on Exhibit D, "no Intellectual Property of BNS is incorporated into or is used in connection with the Purchased Assets or Lantern."

37. In Section 2.6(f) of the APA, BNS covenanted: "From and after the Closing, BNS shall have no right to use (and shall not use) or receive the benefit of the Purchased Assets, and the Purchased Assets (including the end user data and similar customer lists) will be considered the confidential information of Innovate Labs subject to Section 4.2." In Section 4.2, BNS agreed to "keep strictly confidential, and not use or disclose to any other Person, any non-public document or other information that relates to the Purchased Assets, Lantern or Innovate Labs." In Section 4.5, BNS covenanted for five years "not to compete, or assist a third party to compete, with Innovate Labs' prospective use of the Purchased Assets." In Section 4.1(b), BNS agreed that if it were later discovered that BNS "owns or holds rights to any tangible or intangible assets or

properties that should have been Purchased Assets," BNS would "promptly transfer, assign and convey" them to the Debtor "without any additional consideration." And in Section 4.6, BNS granted the Debtor a non-exclusive, perpetual, irrevocable, fully-paid license to the source code of "all closed source software now or in the future created by or for BNS." The only transition accommodation for BNS was Section 4.7, under which BNS could continue to use the transferred servers and accounts for an initial one-year period, "subject to Innovate Labs' business needs," with monthly cost true-ups, continuing thereafter only until either party terminated the arrangement on thirty days' written notice; nothing in the APA conferred on BNS any right to own, register, or hold out as its own the transferred accounts, domains, or data.

38. The purchase price was $404,719, which BNS's auditor later described as having been "determined to be the fair value by an unrelated valuation expert," payable in six annual installments of $67,453.17 beginning on the Closing Date and continuing through March 12, 2024, plus, upon any Sale of the Company within ten years, an amount equal to the greater of $404,719 or 2% of the cash consideration received by holders of Common Units, less installments already paid. The Debtor paid every installment, including the final $67,453 installment, which BNS's audited financial statements confirm had been paid in full "as of December 31, 2024," with BNS's 2024 cash-flow statement reflecting collection of the $67,453 during 2024 — that is, within one year before the Petition Date and at a time when, as alleged below, the Debtor was insolvent.

39. The Debtor's ownership of the Lantern intellectual property was entrenched in the LLC Agreement, which defines the "Lantern Assignment Agreement" as an Intellectual Property Assignment Agreement between the Debtor and BNS (which, upon information and belief, is or was succeeded by the IP Assignment), and which provides in Section 6.3(e) that "any amendment, waiver or termination of the Lantern Assignment Agreement shall require the unanimous approval

of any Founder Managers then serving on the Board of Managers.” Upon information and belief, no such amendment, waiver, or termination was ever approved, and none is reflected in the Debtor’s records or schedules. Accordingly, on the Petition Date, the Purchased Assets, the End User Data, the Proprietary Code, the PRC “Lantern” registration, the Lantern Pro subscriber relationships and subscription revenue stream, the Lantern app-store listings and developer accounts, the Debtor’s government grant contracts and pipeline, and all goodwill associated with the Lantern business (collectively, the “Lantern Assets”) were property of the Debtor and became property of the estate under 11 U.S.C. § 541(a).

**The LLC Agreement and the Fiduciary Duties Owed to the Debtor**

40. The Debtor was managed by a Board of Managers. Section 6.1(a) of the LLC Agreement provided for a two-member Board consisting of two “Founder Managers,” Donnelly and Fisk, each to serve “for so long as he continues to serve as an employee or consultant of the Company.” Section 7.1 designated Donnelly as Chief Executive Officer and Adam Fisk as President and Secretary. Section 13.1(p) defined a “Majority in Interest of the Members” (i.e., the vote required to change the size of the Board, elect Managers, amend the LLC Agreement, or dissolve the Debtor) as “Members holding more than 50% of all of the Units, which must include the approval of each Founder for so long as such Founder continues to serve as an employee or consultant of the Company.” Section 11.2(c) required “the approval of the Board and a Majority in Interest of the Members” for any non-ministerial amendment.

41. Section 6.8 of the LLC Agreement, titled “Fiduciary Duties of the Managers,” provides: “A Manager will be deemed to owe the same fiduciary duties to the Company and the Members as a director of a Delaware corporation owes to such corporation and the stockholders of such corporation under the laws of the State of Delaware.” The LLC Agreement contains no

provision restricting or eliminating fiduciary duties under 6 Del. C. § 18-1101(c), no related-party or interested-transaction safe harbor, no corporate-opportunity waiver, and no authorization for any Manager or Member to compete with the Debtor. Section 8.1(a) exculpates Managers and officers only for acts "performed … in good faith (except for intentional misconduct or recklessness) pursuant to the authority granted to such Manager or officer," and Section 8.1(b) excludes from indemnification any act "committed without authority granted pursuant to this Agreement or in bad faith or otherwise constituting recklessness or willful misconduct."

42. Accordingly, at all times material hereto, Adam Fisk, as a Manager, officer, and controlling member of the Debtor, and Aiken, as a Manager of the Debtor from December 2023 forward, owed the Debtor fiduciary duties of loyalty, care, and good faith equivalent to those owed by a director of a Delaware corporation. Rachel Fisk and Hayes, as officers and persons exercising control over the Debtor's operations and finances, owed the Debtor the same duties under Delaware law.

**One Workforce, One CFO, One Set of Servers: The Debtor and BNS Under Common Control**

43. From 2015 forward, the Debtor and BNS operated as a single integrated enterprise under Fisk's control. Hayes described the arrangement in the Debtor's books as follows: "The majority of our staff (employees and members) work for both BNS and Innovate. All staff track the time they spend on each entity and report it on timesheets. Each month the accounting department review[s] timesheets and allocates the cost of wages, guaranteed payments, health benefits, payroll taxes, workers comp, and disability insurance between the two companies based on the proportion of each person's time that is spent on each company. In this sense, Innovate acts a bit like a PEO to BNS." The Debtor booked the resulting charges as "Management Fees from

BNS," in the following amounts for each year: $660,528 (2018), $454,191 (2019), $1,086,967 (2020), $1,215,494 (2021), and $1,291,238 (2022). By design, these charges "net[ted] to zero" against the Debtor's payroll costs. The Debtor thus supplied BNS's entire workforce at cost, with no margin, for years.

44. Fisk was aware of this arrangement, as he confirmed in a written statement in 2023: "BNS and Innovate established a course of dealing whereby BNS, which has no employees, would 'lease' time from the members/employees/contractors of Innovate … these individuals log the time that they work on Innovate issues and BNS issues on monthly timesheets and Mary Tiller allocates these costs to either Innovate or BNS accordingly." "BNS then pays the compensation and benefits owed to the Innovate workers for that pay period."

45. BNS's audited financial statements confirm the scale of the intercompany relationship. According to Note 4 to BNS's financial statements for 2022, 2023, and 2024, BNS incurred "costs for shared labor and other operating items charged by Innovate" of $3,575,679 (2022), $3,801,777 (2023), and $1,665,777 (2024) — a total of $9,043,233 — against which BNS credited the Debtor's "pro rat[a] share of server and other costs" of $855,872, $762,314, and $586,570, respectively, and made net cash payments. BNS's Forms 990 for 2022 and 2023 report that BNS had zero W-2 employees; its personnel costs were labeled "Outsourced staff" in its audited statements and described on its Forms 990 as services from "another organization" — i.e., the Debtor.

46. Hayes kept both the Debtor's and BNS's books simultaneously, and effectuated the intercompany transfers between the two entities. This intercompany "cost sharing" arrangement was not formalized in any kind of written agreement.

47. Fisk's aggregate salary from the Debtor and BNS was exactly $270,000 in both 2022 and 2023, allocated between the two entities in different proportions each year (65% from the Debtor in 2022, 22% in 2023, 7% in 2024, and 0% in 2025) as the two entities' common accounting function, under Fisk's control, shifted his time "from" the Debtor "to" BNS. Other key personnel were paid by both entities in the same manner, including Wegmann (BNS "CTO"), Frech (BNS "Director of Product Design"), and other employees, including engineers, reported on BNS's Forms 990.

**The Debtor's Financial Decline**

48. Beginning in 2020, the Debtor's subscription revenue declined sharply, from $7,683,460 in 2019; to $4,975,375 in 2020; to $4,205,614 in 2021; and to $2,663,258 in 2022.

49. The Debtor's books reported negative "Net Operating Income" of $880,928 in 2020, $236,985 in 2021, and $1,494,134 in 2022 before crediting the at-cost "Management Fees from BNS," and net income of only $17,483 in 2020 and $225,260 in 2021, followed by a net loss of $532,342 in 2022. As to profit-based bonuses to the Founders and other members, "[d]ue to decreased cash flow, bonuses have not been paid since early 2022"; by 2022 the Debtor "no longer ha[d] sufficient cash flow to make th[e]se donations" to BNS. Notwithstanding its deteriorating results, however, the Debtor still paid Fisk and Donnelly "Contractual Management Fee" bonuses of $184,783 in 2020 and $532,419 in 2021.

50. By the first quarter of 2023, the Debtor's OTF grants had ended and its remaining government grant was winding down. As the Debtor's books state, the OTF Rapid Response grant "ended as of 3/31/23 and is not being renewed again," the OTF TAS grant "ended as of 3/31/23 and is not being renewed again," and the DRL grant was "coming to a close." Hayes warned in May 2023 that "now that all our grants are ending, [subscription revenue] will be the only

substantial source of revenue to Innovate." According to the Debtor's Statement of Financial Affairs, its gross revenue fell from $6,000,000 (2022) to $2,700,000 (2023) to $1,000,000 (January 1 through October 8, 2024). Fisk stated in 2023 that "Alipay and WeChat Pay have terminated Innovate's account, thereby significantly impacting Innovate's ability to transact in China," and that the Debtor "has no active grants or cooperative agreements with the US government or any related entities."

51. At the same time, BNS's revenue grew. BNS's total revenue was $4,441,873 (2021), $6,079,617 (2022), and $8,882,400 (2023). In 2022, BNS received contributions of $1,010,071, 99% of which came from a single contributor, and in 2023 BNS recorded $4,039,372 of "program income" from a single unidentified customer. As alleged below, upon information and belief, the grant awards, donations, and revenue opportunities that were generated by the Lantern business, pursued by the Debtor's personnel at the Debtor's expense, and belonging to the Debtor, were instead directed by Fisk into BNS.

**The Founder Dispute, the Blocked Valuation, and Fisk's Stated Plan to Cut the Debtor Off in April 2024**

52. In or about June 2022, Donnelly took a medical leave of absence. On July 27, 2022 Donnelly wrote to Fisk demanding that Fisk stop diverting to BNS revenue-generating products and funding that belonged to the Debtor, on the ground that doing so was "destroying shareholder value, holding the company back from thriving financially, and breaching his fiduciary duty." Fisk and Donnelly thereafter agreed to negotiate a buy-out of Donnelly's interest, and engaged Marcum LLP ("Marcum"), a national accounting firm, to perform an independent valuation of the Debtor, with each Founder responsible for a share of Marcum's fees.

53. On April 12, 2023, Fisk and Donnelly executed a written Side Letter Agreement governing the Marcum engagement (the "Side Letter"). In the Side Letter, the Founders recited that "a valuation of the Company is in the best interests of the Company;" agreed that "[n]othing will be sent to Marcum by the Company or by either FOUNDER except by mutual agreement of the FOUNDERS through their counsel;" agreed that any dispute over documents or information to be supplied to Marcum would be resolved by a meet-and-confer between counsel and, failing that, by mediation; designated Hayes (as "Mary Tiller") as the Debtor's representative and Marcum's primary contact; allocated 75% of Marcum's fees to the Debtor and 12.5% to each Founder; and acknowledged that any violation of the Side Letter "will cause irreparable injury to the Company," which "shall be entitled to an injunction, restraining order or other equitable relief to prevent breaches." Upon information and belief, the Debtor paid its share of Marcum's fees.

54. From mid-2022 forward, Fisk alone controlled the Debtor's day-to-day operations, its personnel, its bank accounts, its books, and its relationship with BNS.

55. In or about July 2023, in connection with the Marcum valuation, Fisk submitted a written "Statement of Adam Fisk for Marcum Valuation" in which he set out, in his own words, the plan that he would carry out over the following fifteen months:

> (a) "Innovate's only market for Lantern Pro was through upselling to users who download Lantern Free from BNS. Lantern Pro is not offered independent of BNS's platform and is not separately marketed for sale."
>
> (b) "This noncompete expires March 2024. … after March 2024 [BNS] has no obligation to refrain from competing with or helping other parties to compete with Lantern Pro."

(c) "Given the current dispute between the founders of Innovate and the threats made to BNS by Mr. Donnelly, BNS is contemplating dispensing with promoting the Lantern Pro on its platform starting April 2024 and either (i) not upselling to any monetized product through its open-source product or (ii) upselling a different anti-censorship tool from Lantern Free."

(d) "[W]hile BNS benefits from working with Innovate's members/employees/contractors …, it is contemplating engaging other coding and engineering experts outside Innovate or hiring its own employees to work on its product."

(e) "Currently, BNS is most active in Russia, the UAE, and Iran and will experience little to no disruption in advancing its mission if it chooses to dispense with the Innovate relationship."

56. Fisk thus disclosed, in writing, that BNS, an entity he founded and presided over, was "contemplating" appropriating the Debtor's sole distribution channel, replacing the Debtor's sole product, and hiring away the Debtor's workforce, and that it could do so beginning in April 2024 once the APA non-compete expired. Although Fisk asserted in the same statement that he had "recused himself from BNS's decision making regarding a continued relationship with Innovate," he remained BNS's President and Executive Director, and signed every BNS tax return, throughout the period in which that decision was made and carried out. Nothing in the Debtor's records reflects that Fisk ever presented this plan to the Debtor's Board, sought the approval of the Debtor's disinterested members, or caused the Debtor to seek any consideration from BNS for the business BNS intended to take.

57. At the same time, Fisk, "as directed by the other board members of BNS," refused to provide BNS's financial statements, bank records, revenue data, and BNS-only grant applications to Marcum, and disputed that Lantern's free users — "over 95%" of all Lantern users — belonged to the Debtor, calling that claim "murky at best." Contrary to Fisk's statement, the Debtor had purchased the End User Data and the associated user base (among the many other assets set forth in the APA) from BNS in 2019. Upon information and belief, neither Fisk nor BNS invoked the meet-and-confer and mediation procedure that the Side Letter required with respect to the dispute over BNS's information.

58. As reflected in the August 28, 2023 response of Donnelly's counsel, Fisk's counsel asserted in an August 4, 2023 letter that Donnelly had "constructive[ly]" resigned from the Debtor, cited the Debtor's "perilous financial condition," and made a settlement proposal for Donnelly's interest that Donnelly's counsel characterized as "zero." In or about July 2023, according to Donnelly, Fisk caused the Debtor to stop paying Donnelly's salary and to terminate his family's health coverage. According to Donnelly, Fisk then installed his wife, Rachel Fisk, as the Debtor's Chief Executive Officer; by no later than December 2023, Fisk himself was signing for the Debtor as its "Chief Executive Officer."

59. On November 2, 2023, according to Donnelly, after approximately a year of work by Marcum, counsel acting for the Debtor (Thompson Hine LLP) emailed Marcum, with a copy to both Founders' counsel, instructing Marcum to stop work on the valuation and stating: "At this time, the Company does not believe it is beneficial for the valuation process to proceed and is instructing Marcum to place this project on hold." Upon information and belief, that instruction was given without Donnelly's agreement, and therefore not "by mutual agreement of the FOUNDERS through their counsel," as the Side Letter required. No independent valuation of the

Debtor was ever delivered, and Fisk and Donnelly never reached an agreement on the buy-out of Donnelly's interest.

**Fisk Diverts the Debtor's Grant Funding to BNS**

60. The Debtor had historically obtained OTF grants in its own name, including the $900,000 seed grant that funded the Android version of Lantern Pro and the OTF Rapid Response and Technology at Scale awards that generated $3,209,829 of revenue for the Debtor between 2021 and March 2023. OTF's published annual report for fiscal year 2022 lists the "Lantern" Surge and Sustain Fund award, in the amount of $2,987,755, as made to "Innovate Labs LLC."

61. Upon information and belief, beginning no later than February 2022 and continuing through 2024, Fisk caused new and renewal grant applications generated by the Lantern business and prepared by the Debtor's personnel to instead be submitted in the name of BNS rather than the Debtor. In December 2022, according to Donnelly, Fisk concealed from Donnelly a BNS grant generating approximately $1,000,000 per month that was originally intended to flow through the Debtor.

62. OTF's public reports confirm the change. Whereas OTF's fiscal-year-2022 report lists the Lantern Surge and Sustain Fund award as made to "Innovate Labs LLC" ($2,987,755), OTF's fiscal-year-2023 report lists a Lantern Surge and Sustain Fund award, in the amount of $3,067,426, as now made to "Brave New Software Project Inc." OTF's fiscal-year-2024 report lists a further Lantern award of $480,567 made to BNS.

63. The Debtor's books reflect that its OTF grants ended by March 31, 2023 and were "not being renewed again," and that its DRL grant was "coming to a close." The Debtor reported gross revenue of only $2,700,000 for 2023 and $1,000,000 for 2024. BNS's audited statements, however, show federal award revenue of $4,813,977 in 2023 and $2,821,640 in 2024, with

$3,234,765 in unrecognized cost-reimbursable awards still available to BNS at December 31, 2024. BNS's 2025 Form 990 reports $2,487,788 in government grants.

64. The grant contracts, the pipeline of renewals, and the relationships with OTF, the State Department, and their pass-through intermediaries were business opportunities in the Debtor's line of business, in which the Debtor had an interest and expectancy, and which the Debtor was financially able to undertake. Fisk diverted those grants and opportunities to BNS without disclosure to or approval by the Debtor's Board or members and without any consideration to the Debtor (the "Grant Transfers").

**Fisk Seizes Control of the Board and Rewrites the LLC Agreement**

65. By written consent electronically signed between December 20 and December 29, 2023 (the "December 2023 Consent"), Fisk, Frech, Carson Fisk-Vittori, Helen Hood, Harry Harpham, and Noah Levenson — purporting to act as a "Majority in Interest of the Members" — (i) increased the size of the Board from two to three Managers, (ii) elected Aiken to the Board to fill "one of the current vacancies," and (iii) adopted an amendment to the LLC Agreement that deleted Donnelly as a "Founder Manager," designated Fisk as the sole "Founder Manager," and provided that in any two-Manager stalemate "the longest tenured member of the Board" (i.e., Fisk) "shall have the ability to cast the tiebreaking vote." Donnelly, the holder of 4,000,000 Common Units and a "Founder" whose approval was required under Section 13.1(p), did not sign and, upon information and belief, received no notice of the December 2023 Consent. The December 2023 Consent recites no Board approval as required by Section 11.2(c), and the signatories' Units, as reflected on the Debtor's most recent Unit Register, do not appear to exceed 50% of the Units outstanding. Fisk executed the amendment for the Debtor as "Chief Executive Officer," an office that the LLC Agreement assigned to Donnelly.

66. On March 6, 2024, Fisk, again signing as the Debtor's "Chief Executive Officer" and as a Manager, executed a further amendment to the LLC Agreement adding a Delaware exclusive-forum clause and a waiver of jury trial by every Member, which was circulated to members for signature on or about March 14, 2024. Upon information and belief, these amendments were adopted in anticipation of litigation that Donnelly had threatened in August 2023, and for the purpose of consolidating in Fisk alone the power to dispose of the Debtor's assets.

**The Donnelly Lawsuit, the Expiration of the Non-Compete, and the Decision to Strip the Debtor**

67. On March 12, 2024, the final APA installment came due and was paid to BNS. On this date, the five-year APA non-compete period also expired.

68. On April 24, 2024, Donnelly filed suit against the Debtor, BNS, and Fisk in the Superior Court of California, County of Los Angeles, captioned *Donnelly v. Innovate Labs, LLC, et al.*, No. 24STCV10323 (the "Donnelly Action"), alleging, among other things, that Fisk had "divert[ed] revenue, funding and grants from the Company to the sister BNS company," had "transferred valuable assets of the Company to BNS and acquired nine (9) newly established clandestine entities," and was attempting "to merge the interests of Innovate Labs LLC with BNS."

69. Fisk's response to the Donnelly Action was to accelerate the plan he had laid out in 2023. As set forth in greater detail below, between August 16 and October 8, 2024 — while the Donnelly Action was pending, while the Debtor's 2023 tax distributions to its members remained unpaid, and while the Debtor, by Fisk's own later admission, was in a "dire" financial condition — Fisk caused the Debtor's remaining assets to be transferred to BNS, closed the Debtor's accounts, paid himself, and filed the Debtor's Chapter 7 petition.

**The 2024 Transfers: The Lantern Business Migrates to BNS**

70. BNS reported zero W-2 employees in 2022 and 2023. In 2024, BNS suddenly reported eleven W-2 employees and $1,735,087 in salaries, compensation, and benefits, with similar numbers again reported in 2025. Over the same period, the Debtor's labor charges to BNS fell from $3,801,777 in 2023 to $1,665,777 in 2024, and, upon information and belief, to zero in 2025. The hours and compensation that BNS reported its officers and key employees receiving from the Debtor fell to zero. Upon information and belief, the individuals whom the Debtor had employed, trained, and paid to build and operate Lantern became BNS's employees during 2024, just as Fisk had said BNS was "contemplating" in 2023. No consideration for the transfer is disclosed in the Debtor's schedules or in any BNS filing, and upon information and belief the Debtor received nothing for the transfer of its assembled workforce, know-how, and institutional knowledge (the "Workforce Transfer").

71. The "lantern.io" domain, a Purchased Asset under the APA and the primary consumer-facing website for Lantern and Lantern Pro, was, according to its WHOIS record, "Updated" on September 9, 2024. Upon information and belief, the registrant organization was changed on or about that date to "Brave New Software Project, Inc," Colorado. Upon information and belief, the getlantern.org domain (the website listed on the Debtor's petition), the remaining Purchased Asset domains, and the Debtor's Cloudflare, hosting, and cloud-provider accounts were likewise transferred to BNS's control in or about September 2024, without consideration (the "Domain and Account Transfers"). As of the date of this Complaint, the DMCA page of lantern.io still identifies "Innovate Labs,LLC ('Lantern')" as the provider of the site's services and lists a designated copyright agent at the Debtor's former Pasadena address, beneath a footer reading "Copyright © 2026 Brave New Software Project, A 501c3 nonprofit."

72. On August 29, 2024, version 8.0.0 of the Lantern iOS application was released with release notes announcing "secure username and password login" and that "[n]ow you can upgrade to the Pro version for exclusive features." As of September 13, 2024, the Apple App Store listing for "Lantern: Fast, Secure VPN" identified the seller as "Innovate Labs, LLC." By October 5, 2024, the Google Play listing for the same application identified the developer as "Team Lantern." Thereafter, both the Apple and Google listings were changed to identify the seller and developer as "Brave New Software Project, Inc," with in-app purchases including "Lantern Pro: One Year Plan $55.99" and "Lantern Pro: Two Year Plan $100.99" — the identical product and feature set that Fisk described in 2023 as the Debtor's "only product." Upon information and belief, Fisk caused the Debtor's Apple and Google developer accounts, its Stripe and other payment-processor accounts, its existing subscriber accounts and renewal rights, and the associated End User Data to be transferred or re-designated to BNS in or about September and October 2024, without consideration (the "Subscription Business Transfer"). BNS's books reflect the result: BNS recorded "Subscription income" for the first time in any of its Forms 990 or audited statements in 2024 ($44,337), adopted a new "subscription revenue recognition" accounting policy in its 2024 audited statements, and in 2025 recorded $627,931 of subscription income and $627,616 of "deferred revenue." No purchase of a subscriber base, software, or intellectual property from the Debtor is disclosed anywhere in BNS's filings, and BNS answered "No" on its Forms 990 to whether it had received more than $25,000 in non-cash contributions.

73. Upon information and belief, in connection with the foregoing, Fisk caused the Debtor's Proprietary Code (including the flashlight client, the Lantern Pro server and client code, the authentication and reseller systems, and the iOS and desktop applications), the getlantern GitHub organization, the Debtor's End User Data, its subscriber and mailing lists, and the goodwill

of the Lantern and Lantern Pro brands to be placed under BNS's exclusive control and used by BNS as its own (the "IP Transfer"). Upon information and belief, the estate's code was subsequently used to build a general-purpose "Lantern VPN" with user-selectable servers, which BNS was advertising to Russian-language users by June 2025 as offering "50 серверов в 50 странах" ("50 servers in 50 countries"), for which BNS opened beta sign-ups in July 2025, and which BNS now markets to users in uncensored countries. According to Donnelly, this is the "Global VPN" product that the Debtor's personnel had been developing at the Debtor's expense before Fisk transferred away the Debtor's business to BNS.

74. According to BNS's audited financial statements, BNS owed the Debtor $325,013 as of January 1, 2024. During 2024, BNS charged the Debtor $586,570 as the Debtor's "pro rat[a] share of server and other costs" (an amount determined by the Debtor's and BNS's common management) and applied that charge against its debt to the Debtor, reducing the intercompany balance to zero by December 31, 2024. Upon information and belief, some or all of that setoff, and some or all of BNS's $1,404,220 in 2024 payments to the Debtor, occurred within ninety days before or after the Petition Date (the "Intercompany Setoff"). During 2024 the Debtor also paid BNS the final $67,453 APA installment (the "APA Installment Transfer").

75. The Grant Transfers, the Workforce Transfer, the Domain and Account Transfers, the Subscription Business Transfer, the IP Transfer, the Intercompany Setoff, and the APA Installment Transfer, together with the Debtor's cash donations to BNS on and after October 8, 2020 (which, according to the Debtor's books, totaled $550,338 in 2021 and $4,533 in 2022, in addition to that portion of the $460,047 donated in 2020 that was paid on or after October 8, 2020) and the Debtor's provision of personnel and services to BNS at no margin on and after October 8, 2020, are referred to collectively herein as the "BNS Transfers." Each of the BNS Transfers was

a "transfer" within the meaning of 11 U.S.C. § 101(54) of property, or of an interest in property, of the Debtor, made to or for the benefit of BNS.

76. Taken together, the BNS Transfers constituted a transfer of substantially all of the Debtor's operating assets. What remained on the Petition Date, according to the Debtor's own schedules, was $151,113 in cash and cryptocurrency, $27,786 in net receivables, $6,747 in prepaid insurance, $800 in a tax refund, six domain names valued at $1,583.33, and "Copyrights to code repositories" carried at a "cost-based" value of $1,088,248 — the very code that BNS was and is still using.

**Insider Payments and Account Closures on the Eve of Bankruptcy**

77. While the Lantern business was being moved to BNS, Fisk caused the Debtor to pay him $240,500 in "Guaranteed Payment[s]" between October 17, 2023 and August 30, 2024 — a period during which the Debtor's revenue had collapsed, its grants had ended, its 2023 tax distributions to members (due no later than April 1, 2024 under Section 5.1 of the LLC Agreement) went unpaid, and Fisk's own time, by BNS's account, was 93% devoted to BNS (the "Fisk Payments"). Although the Debtor's Statement of Financial Affairs disclosed the $240,500 in response to Question 30 (payments, distributions, or withdrawals credited or given to insiders), it answered "None" to Question 4 (payments or other transfers of property made within one year before filing that benefited any insider).

78. Upon information and belief, Fisk also received distributions from the Debtor within the four years before the Petition Date, including in 2022, at times when the Debtor's liabilities exceeded the fair value of its assets (the "Fisk Distributions"), and received his share of the 2020 and 2021 "Contractual Management Fee" bonuses at a time when the Debtor's books

reported negative operating income (the "Fisk Bonus Transfers" and, together with the Fisk Payments and the Fisk Distributions, the "Fisk Transfers").

79. In the weeks before the Petition Date the Debtor also paid $19,750 to Frech between July 1 and August 30, 2024, which the Debtor's Statement of Financial Affairs reports, in response to Question 3, as payments for "Services" made within ninety days before the Petition Date. The same schedule reports payments of $19,374.99 to Harry Harpham, a member of the Debtor and a signatory to the December 2023 Consent, between July 11 and August 30, 2024, and payments of $10,890 to "Break Free Software, LLC," Las Vegas, Nevada, between August 9 and September 27, 2024.

80. Between August 16, 2024 and September 23, 2024 — beginning five days before the bankruptcy retainer was paid — the Debtor closed fifteen bank and investment accounts: one Merrill Lynch investment account (closed August 16, 2024), six Bluevine checking accounts (closed on or about September 5, 2024), and eight First Internet Bank of Indiana checking accounts (closed September 12 and 23, 2024). The Debtor's Statement of Financial Affairs reports the "last balance before closing" of every one of the fifteen accounts as "0" (and gives only an approximate closing date for the six Bluevine accounts), does not disclose the balances in the accounts before they were emptied, identifies the account number of only one of the eight First Internet Bank accounts, and does not disclose where the funds went. The Debtor answered "None" to the question whether it had made any transfer outside the ordinary course of business within two years before the Petition Date. Upon information and belief, the fourteen Bluevine and First Internet Bank accounts were associated with the undisclosed subsidiaries and payment-processing entities described in the Debtor's books as "specific subsidiaries that Innovate opened or considered

opening for the purpose of pursuing additional revenue streams," and funds in those accounts were transferred to BNS, to Fisk, or to entities owned or controlled by them.

**The Chapter 7 Filing and the False and Incomplete Schedules**

81. On October 7, 2024, Fisk executed a document titled "Unanimous Written Consent of the Board of Managers of Innovate Labs, LLC," reciting that "the undersigned, being all of the members of the board of managers" had determined that a Chapter 7 petition should be filed because "the financial condition of the Company is dire due to the diminishing financial prospects of the Company and other pending litigation." Fisk was the only signatory. Nine months earlier the December 2023 Consent had fixed the size of the Board at three Managers. The consent contains no reference to other Managers or explanation of their status on the Board. The Debtor's Statement of Financial Affairs, signed by Fisk the following day, lists Aiken as a "Director" of the Debtor from 2023 to 2024 among persons who purportedly "no longer hold" their positions, but neither the consent nor the Statement of Financial Affairs identifies when, how, or by whose action Aiken ceased to serve.

82. On October 8, 2024, Fisk, as "CEO and Director," signed and caused to be filed the Debtor's Chapter 7 petition, schedules, and Statement of Financial Affairs under penalty of perjury. Those filings:

(a) do not mention BNS anywhere — not as a creditor, a contract counterparty, an affiliate, a transferee, a donee, or a related business — notwithstanding that BNS was the Debtor's counterparty under the APA and the IP Assignment, its largest customer, the recipient of $1.8 million in donations and $9 million in billed services, and the entity to which the Debtor's business had just been moved;

(b) answer “None” to Question 13 (transfers outside the ordinary course within two years), Question 4 (transfers benefiting insiders within one year), and Question 25 (other businesses in which the Debtor held an interest within six years), and “No” to whether the Debtor held any interest in any other entity — notwithstanding the BNS Transfers, the Fisk Payments, the Fisk Distributions, and the Debtor’s ownership of Apamante and its undisclosed subsidiaries;

(c) leave blank Schedule A/B lines 74 and 75 (causes of action and contingent claims), notwithstanding the Debtor’s claims against BNS under the APA and the Debtor’s claims against Fisk and BNS for the conduct alleged herein;

(d) schedule the Debtor’s intellectual property as “Copyrights to code repositories” at a “cost-based” value, omit the “Lantern” trademark, the PRC logo registration, the End User Data, the customer lists (notwithstanding the Debtor’s admission, in response to Question 16 of the Statement of Financial Affairs, that it collected and retained customers’ email addresses), and the subscriber relationships entirely, schedule only six of the ten Purchased Asset domains (omitting lantern.io — the primary consumer-facing Lantern website — getiantem.org, flashlightproxy.com, and flashlightproxy.org), and omit any identification of the Yinbi tokens (scheduling only unspecified “Crypto currency in Bitmart accounts” of $24,601.71);

(e) schedule no executory contract with BNS, no payment-processor agreement, no hosting or cloud agreement, and no developer-account agreement, notwithstanding that the Lantern business could not operate without them; and

(f) represent that Fisk and Donnelly each own 47.67% of the Debtor, thereby confirming that Donnelly remained a member and Founder throughout the period in which Fisk purported to act without him.

83. On November 11, 2024, Fisk filed Proof of Claim No. 2 against the estate in the amount of $124,190. Frech filed Proof of Claim No. 3 in the amount of $9,149.

**BNS Operates the Debtor's Business After the Petition Date**

84. BNS did not stop its misconduct on the Petition Date. On or about the Petition Date, a new version (7.9.7) of the Lantern Android application was released, and BNS has released new versions continuously since, including versions 7.9.8 (October 2024), 7.9.9 (November 2024), 8.1 through 8.3 (2025), 9.x (2026), and 10.0.0 (September 2026). On November 25, 2024, Fisk gave a video interview to a Russian-language channel, which was promoted on Telegram under the heading "Lantern CEO Adam Fisk," and in which, as reported by Donnelly's counsel, he described Lantern as "a USA based non profit," stated that "we're rolling out new versions on a weekly basis," and promoted a version of Lantern offering an "Upgrade to Lantern Pro" to users in Russia at 3,651 rubles per year.

85. From at least March 6, 2025 through at least September 26, 2025, BNS, as a verified advertiser using Google Ad Grants, ran paid search advertisements in Persian, Chinese, Russian, and English directing users to lantern.io and to the Lantern app-store listings, promoting the "Pro" version ("专业版更稳定" — "the Pro version is more stable") and "50 servers in 50 countries." In July 2025, sign-ups for a beta of "the new Lantern VPN" were opened on lantern.io, a site BNS by then controlled, with invitations sent from beta@getlantern.org by "Derek, Product @ Lantern." BNS's Terms of Service and Privacy Policy for Lantern, "last updated November 2025," identify Brave New Software Project, Inc. as the contracting party and data controller, Colorado law as

governing, and Apple, Google Play, and Stripe as payment processors. In March 2026, Fisk, identified as "head of US-based nonprofit Lantern," publicly stated that "Lantern is a US-based nonprofit that earns revenue from Lantern Pro users worldwide who pay for a better version." BNS's 2025 Form 990 reports $627,931 of subscription income, $627,616 of "deferred revenue," and a new liability of $450,801 described as "Funds held for others."

86. BNS has never sought or obtained authorization from the Bankruptcy Court or the Trustee to use, sell, or exercise control over any property of the estate. Every dollar of subscription revenue, every app-store payout, every grant reimbursement attributable to the Lantern Assets, and every use of the estate's domain names, code, trademarks, developer accounts, and End User Data by BNS on and after October 8, 2024 (collectively, the "Post-Petition Transfers") constitutes an unauthorized transfer of property of the estate and an exercise of control over property of the estate in violation of 11 U.S.C. § 362(a)(3).

**The Debtor Was Insolvent**

87. At all times from January 1, 2022 through the Petition Date, and at the time of each of the BNS Transfers and Fisk Transfers made during that period, the Debtor was insolvent within the meaning of 11 U.S.C. § 101(32) and 6 Del. C. § 1302, was engaged in a business for which its remaining assets were unreasonably small, and intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due, in that, among other things:

> (a) the Debtor's books reported negative operating income in 2020, 2021, and 2022, and a net loss of $532,342 in 2022 even after crediting $1,291,238 of at-cost "Management Fees from BNS";

(b) the Debtor's revenue declined from $6,000,000 (2022) to $2,700,000 (2023) to $1,000,000 (2024), and its OTF grants ended by March 31, 2023 with no renewal while its remaining DRL grant was "coming to a close";

(c) the Debtor's principal Chinese payment channels were terminated by 2023, and by Fisk's account the Debtor's only remaining product depended entirely on a distribution channel that BNS had announced it intended to withdraw in April 2024;

(d) the Debtor was unable to pay, and did not pay, the 2023 Tax Distributions owed to its members under Section 5.1 of the LLC Agreement when due on April 1, 2024, and scheduled $264,537 of such obligations as unpaid (describing them, however, as "incurred" on August 29, 2024);

(e) the Debtor was, from no later than August 2023, subject to a threatened, and from April 2024 pending, claim by Donnelly, who in August 2023 had demanded $26,000,000 for his interest in the Debtor, which the Debtor's Board itself identified as a cause of its "dire" condition, and which the Debtor scheduled as an "UNDETERMINED" liability;

(f) the Debtor's own Board, in the October 7, 2024 consent, acknowledged that "the financial condition of the Company is dire"; and

(g) as of the Petition Date, the Debtor had ceased operations, had closed fifteen bank and investment accounts, leaving a single Chase checking account, and scheduled total liabilities as "UNDETERMINED."

88. To the extent the Debtor was not insolvent before the BNS Transfers, it was rendered insolvent by them: the transfer of the Debtor's workforce, distribution channel,

subscribers, website, and grant pipeline to BNS left the Debtor with no operating business, no revenue, and no ability to satisfy its obligations.

**Badges of Fraud**

89. The BNS Transfers and the Fisk Transfers were made with the actual intent to hinder, delay, and defraud the Debtor's creditors, including Donnelly, the Debtor's minority members who were owed 2023 Tax Distributions, the taxing authorities scheduled by the Debtor, and the Debtor's trade creditors. That intent is established by, among other things, the following badges of fraud:

(a) Fisk was an insider who controlled both the transferor and the transferee; BNS is an affiliate of the Debtor and of Fisk; and the Fisk Transfers were to Fisk himself.

(b) The same person (Fisk), the same personnel, the same website, the same apps, and the same mailbox address continued to operate the Lantern business after the transfers, under the BNS name.

(c) The transfers were concealed. BNS is not mentioned in the Debtor's petition, schedules, or Statement of Financial Affairs; the Debtor denied under oath having made any transfer outside the ordinary course; BNS answered "No" on each of its Forms 990 to whether it was related to any taxable entity and filed no Schedule R identifying the Debtor, even while reporting compensation paid by a "related organization," a "Due to related organization" liability, and a Schedule L transaction with Fisk as "Part owner in LLC"; and BNS's 2024 audited statements, issued April 28, 2025, disclose no subsequent events and do not mention the bankruptcy at all.

(d) Before the transfers were made, the Debtor had been threatened with suit (August 2023) and sued (April 2024), and the transfers accelerated after the Donnelly Action was commenced.

(e) The transfers were of substantially all of the Debtor's operating assets.

(f) The Debtor removed and concealed assets, including by closing fifteen accounts in the eight weeks before the Petition Date while reporting a zero "last balance" for every one of them and disclosing neither the pre-closure balances nor the disposition of the funds, and by omitting the "Lantern" marks, the End User Data, Apamante, and the Debtor's undisclosed subsidiaries from its schedules, and by omitting all causes of action against BNS and Fisk.

(g) The Debtor received no consideration — let alone reasonably equivalent value — for the BNS Transfers.

(h) The Debtor was insolvent at the time of the transfers and, in any event, became insolvent as a result of them.

(i) The transfers occurred shortly after substantial debts were incurred (the unpaid 2023 Tax Distributions and the Donnelly claim) and immediately before the Debtor's bankruptcy filing.

(j) The transfers were planned in advance and disclosed in writing by the transferor's and transferee's common controller more than a year before they were carried out, and were timed to the expiration of the very non-compete that had protected the Debtor's ownership of the business.

(k) Fisk caused the Debtor's independent valuation to be halted, and refused to provide BNS's financial information to the valuation firm, so that the value of the business being transferred would never be established.

**Damages to the Debtor and Its Creditors**

90. As a direct and proximate result of the conduct alleged herein, the Debtor was deprived of its only operating business, its revenue, its workforce, its intellectual property, its customer relationships, its government funding, and its goodwill, and was left an insolvent shell with claims against it that its remaining assets cannot satisfy. The damages to the Debtor include, without limitation, the going-concern value of the Lantern business as of the date of the BNS Transfers; the revenue, grant proceeds, and profits BNS has derived and will derive from the Lantern Assets; the amounts of the Fisk Transfers; and the fees, costs, and expenses incurred by the estate in investigating and remedying the Defendants' conduct. The value of the Lantern business can be measured by, among other things, its historical revenue of more than $7,000,000 per year, its cumulative subscription revenue of more than $27,000,000, its more than 12,000,000 monthly active users, the OTF and State Department awards of approximately $3,000,000 per year, acquisition interest expressed by third parties at valuations of $20,000,000 or more, and the comparable transaction values of consumer VPN businesses. Based on this information, the Trustee believes that the value of the Lantern business substantially exceeds $20,000,000, in an amount to be determined at trial.

91. The conduct of the Defendants, as alleged herein, was intentional, engaged in for an improper purpose and with a bad motive, and sufficiently outrageous to justify the imposition of punitive damages.

## V. THE CLAIMS

### FIRST CLAIM — AVOIDANCE OF FRAUDULENT TRANSFERS
**Pursuant to 11 U.S.C. § 548(a)(1)(A)**
**(Against BNS and Fisk)**

92. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

93. Each of the BNS Transfers and Fisk Transfers made on or after October 8, 2022 (the "Two-Year Transfers") was a "transfer" within the meaning of 11 U.S.C. § 101(54) of property, or of an interest in property, of the Debtor.

94. The Debtor made each of the Two-Year Transfers with the actual intent to hinder, delay, or defraud entities to which the Debtor was or became, on or after the date of such transfer, indebted, as evidenced by the badges of fraud alleged above.

95. Accordingly, each of the Two-Year Transfers is avoidable pursuant to 11 U.S.C. § 548(a)(1)(A), and the Trustee is entitled to judgment avoiding each such transfer and preserving it for the benefit of the estate pursuant to 11 U.S.C. § 551.

### SECOND CLAIM — AVOIDANCE OF FRAUDULENT TRANSFERS
**Pursuant to 11 U.S.C. § 548(a)(1)(B)**
**(Against BNS and Fisk)**

96. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

97. The Debtor received less than a reasonably equivalent value in exchange for each of the Two-Year Transfers. No consideration for the Grant Transfers, the Workforce Transfer, the Domain and Account Transfers, the Subscription Business Transfer, or the IP Transfer is disclosed in the Debtor's schedules or in any BNS filing, and upon information and belief BNS paid nothing for them; the Intercompany Setoff was computed by the Debtor's own conflicted fiduciaries; and

the Fisk Payments and Fisk Distributions were made to a fiduciary who, by BNS's account, devoted as little as 7% of his time to the Debtor while it was being wound down.

98. At the time of each of the Two-Year Transfers, the Debtor (i) was insolvent, or became insolvent as a result of such transfer; (ii) was engaged in a business or transaction for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay as they matured.

99. In addition, and in the alternative, the Fisk Payments were made to or for the benefit of an insider under an employment or compensation arrangement and not in the ordinary course of business, within the meaning of 11 U.S.C. § 548(a)(1)(B)(ii)(IV).

100. Accordingly, each of the Two-Year Transfers is avoidable pursuant to 11 U.S.C. § 548(a)(1)(B), and the Trustee is entitled to judgment avoiding each such transfer and preserving it for the benefit of the estate pursuant to 11 U.S.C. § 551.

**THIRD CLAIM — AVOIDANCE OF FRAUDULENT TRANSFERS**
**Pursuant to 6 Del. C. §§ 1304 and 1305 and 11 U.S.C. § 544(b)**
**(Against BNS and Fisk)**

101. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

102. At all times material hereto, and at the time of each of the BNS Transfers and Fisk Transfers made on or after October 8, 2020 (the "Four-Year Transfers"), there existed at least one creditor of the Debtor holding an unsecured claim that is allowable under 11 U.S.C. § 502 and that could have avoided such transfer under applicable non-bankruptcy law, including without limitation Donnelly (whose claims arose no later than 2022), the members of the Debtor owed unpaid 2023 Tax Distributions, the Internal Revenue Service and the other taxing authorities scheduled by the Debtor, and the Debtor's trade creditors.

103. The Debtor made each of the Four-Year Transfers with actual intent to hinder, delay, or defraud its creditors, within the meaning of 6 Del. C. § 1304(a)(1).

104. In addition, and in the alternative, the Debtor made each of the Four-Year Transfers without receiving a reasonably equivalent value in exchange, at a time when the Debtor was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small, or when the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due, within the meaning of 6 Del. C. § 1304(a)(2); and/or at a time when the Debtor was insolvent or became insolvent as a result of the transfer, within the meaning of 6 Del. C. § 1305(a).

105. In addition, the APA Installment Transfer and the Intercompany Setoff were transfers to an insider for an antecedent debt at a time when the Debtor was insolvent and the insider had reasonable cause to believe that the Debtor was insolvent, within the meaning of 6 Del. C. § 1305(b).

106. To the extent the law of California, Colorado, or Nevada, rather than Delaware, is determined to govern any of the Four-Year Transfers, each such transfer is likewise avoidable under Cal. Civ. Code §§ 3439.04 and 3439.05, Colo. Rev. Stat. §§ 38-8-105 and 38-8-106, or Nev. Rev. Stat. §§ 112.180 and 112.190, respectively, which are materially identical (except that California law contains no counterpart to 6 Del. C. § 1305(b)).

107. Accordingly, each of the Four-Year Transfers is avoidable pursuant to 6 Del. C. §§ 1304 and 1305 and 11 U.S.C. § 544(b), and the Trustee is entitled to judgment avoiding each such transfer and preserving it for the benefit of the estate pursuant to 11 U.S.C. § 551.

**FOURTH CLAIM — AVOIDANCE OF PREFERENTIAL TRANSFERS**
**Pursuant to 11 U.S.C. § 547**
**(Against BNS, Fisk, and Frech)**

108. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

109. The APA Installment Transfer, the Intercompany Setoff, the Fisk Payments, and the $19,750 paid to Frech between July 1 and August 30, 2024 (collectively, the "Preference Transfers") were each transfers of an interest of the Debtor in property, to or for the benefit of a creditor, for or on account of an antecedent debt owed by the Debtor before such transfer was made, made while the Debtor was insolvent, made within one year before the Petition Date to an insider (and, as to the Intercompany Setoff and the payments to Frech as reported in the Debtor's Statement of Financial Affairs, within ninety days before the Petition Date), and that enabled such creditor to receive more than it would receive if the case were a case under Chapter 7, the transfer had not been made, and such creditor received payment of such debt to the extent provided by the Bankruptcy Code.

110. The Debtor is presumed to have been insolvent during the ninety days before the Petition Date pursuant to 11 U.S.C. § 547(f), and was in fact insolvent throughout the one-year period before the Petition Date, as alleged above. The Trustee and his professionals have conducted reasonable due diligence into potential affirmative defenses and have concluded that those defenses are without merit given the nature of and circumstances surrounding the Preference Transfers.

111. Accordingly, the Preference Transfers are avoidable pursuant to 11 U.S.C. § 547(b), and, to the extent the Intercompany Setoff constitutes a legitimate setoff, it is recoverable pursuant to 11 U.S.C. § 553(b).

**FIFTH CLAIM — AVOIDANCE OF POST-PETITION TRANSFERS**
**Pursuant to 11 U.S.C. § 549**
**(Against BNS, Fisk)**

112. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

113. The Post-Petition Transfers include, without limitation, (i) all Lantern Pro subscription revenue and app-store, Stripe, and other payment-processor payouts received by BNS on or after the Petition Date on account of subscriptions sold through the estate's developer accounts, listings, website, and application to the estate's users; (ii) all grant proceeds received by BNS on or after the Petition Date on account of awards, budgets, or deliverables attributable to the Lantern Assets; (iii) any transfer, renewal, or re-registration of the estate's domain names, developer accounts, cloud and hosting accounts, GitHub organization, or payment-processor accounts occurring on or after the Petition Date; and (iv) any post-petition payment or setoff by BNS against amounts owed to the Debtor.

114. The Post-Petition Transfers were transfers of property of the estate that occurred after the commencement of the Bankruptcy Case and were not authorized by the Bankruptcy Code or by the Bankruptcy Court.

115. Accordingly, each of the Post-Petition Transfers is avoidable pursuant to 11 U.S.C. § 549(a), and the Trustee is entitled to judgment avoiding each such transfer.

**SIXTH CLAIM — RECOVERY OF AVOIDED TRANSFERS**
**Pursuant to 11 U.S.C. § 550**
**(Against BNS, Fisk, Frech)**

116. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

117. The Trustee is entitled to avoid the BNS Transfers, the Fisk Transfers, the Preference Transfers, and the Post-Petition Transfers (collectively, the "Avoidable Transfers") pursuant to 11 U.S.C. §§ 544, 547, 548, and 549.

118. As more particularly set forth above, BNS, Fisk, and Frech were initial transferees or the entities for whose benefit Avoidable Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

119. Accordingly, pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to recover from BNS, Fisk, and Frech, jointly and severally to the extent of their respective receipts, the property transferred or, at the election of the Trustee and as the Court may order, the value of such property, together with pre-judgment interest from the date of each transfer, and the Trustee is entitled to judgment against BNS for the value of the Lantern business as of the date of the BNS Transfers, together with all revenues and profits derived therefrom.

**SEVENTH CLAIM — TURNOVER OF PROPERTY OF THE ESTATE AND OF BOOKS AND RECORDS**
**Pursuant to 11 U.S.C. § 542**
**(Against BNS, Fisk, Hayes, and Apamante)**

120. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

121. The Lantern Assets — including the "Lantern" trademark and all common-law and registered rights therein, PRC Registration No. 24441114, the domain names lantern.io, getlantern.org, getlantern.com, getiantem.org, getlantem.org, firetweet.io, flashlightproxy.com, flashlightproxy.org, lantern.network, and natty.io, the @getlantern social-media handles, the getlantern GitHub organization and all repositories therein, the Proprietary Code, all Amazon, Digital Ocean, Vultr, Azure, Microsoft, IBM, Google, Cloudflare, and other server and cloud accounts, the Apple and Google developer accounts and application listings for Lantern, the Stripe

and other payment-processor accounts, the End User Data, all subscriber, customer, and mailing lists, all Yinbi tokens held by or for the Debtor (including by Apamante), all cryptocurrency held in Bitmart or other exchange accounts, and all proceeds of the foregoing — are property of the estate that the Trustee may use, sell, or lease under 11 U.S.C. § 363.

122. BNS, Fisk, and Apamante are in possession, custody, or control of the Lantern Assets and their proceeds, including not less than $672,268 of subscription income recorded by BNS in 2024 and 2025 and the $450,801 that BNS reports as "Funds held for others."

123. Hayes and BNS are in possession, custody, or control of books, documents, records, and papers relating to the Debtor's property and financial affairs, including the Debtor's general ledger, timesheets, intercompany allocation workpapers, bank and payment-processor records, grant applications and awards, and the records of the Debtor's subsidiaries.

124. Pursuant to 11 U.S.C. § 542(a) and (e), the Trustee is entitled to an order directing BNS, Fisk, and Apamante to deliver to the Trustee, and to account for, the Lantern Assets and their proceeds, or the value thereof, and directing Hayes and BNS to turn over all such books, documents, records, and papers.

**EIGHTH CLAIM — VIOLATION OF THE AUTOMATIC STAY**
**Pursuant to 11 U.S.C. §§ 362(a)(3) and 105(a)**
**(Against BNS and Fisk)**

125. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

126. From and after the Petition Date, BNS and Fisk, with knowledge of the Bankruptcy Case, have willfully exercised control over property of the estate, including the Lantern Assets, by operating, marketing, modifying, licensing, and selling the Lantern and Lantern Pro products, collecting subscription revenue, re-registering domain names and accounts, and holding

themselves out as the owner and operator of Lantern, all without authorization from the Bankruptcy Court or the Trustee.

127. Such conduct constitutes a continuing violation of 11 U.S.C. § 362(a)(3). Pursuant to 11 U.S.C. § 105(a) and the Court's inherent civil-contempt authority, the Trustee is entitled to an order declaring the Post-Petition Transfers and all acts by BNS and Fisk in violation of the automatic stay void, enjoining further violations, and awarding the estate compensatory damages, disgorgement of all revenues and profits obtained through the stay violations, and the attorneys' fees and costs incurred by the Trustee in remedying them.

**NINTH CLAIM — BREACH OF FIDUCIARY DUTY**
**(Against the Director and Officer Defendants)**

128. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

129. Fisk owed the Debtor fiduciary duties of loyalty, due care, and good faith. Aiken, as a Manager, owed the Debtor the same duties. Rachel Fisk, as an officer of the Debtor, including as Director of Operations and, according to Donnelly, as Chief Executive Officer, and Hayes, as the Debtor's de facto Chief Financial Officer and the person entrusted with custody of its books, funds, and intercompany accounting, owed the Debtor the fiduciary duties of an officer under Delaware law.

130. The duty of loyalty required the Director and Officer Defendants to act in the best interests of the Debtor rather than of themselves or of BNS; prohibited them from appropriating for BNS business opportunities in the Debtor's line of business in which the Debtor had an interest or expectancy; prohibited self-dealing transactions that were not entirely fair to the Debtor; and prohibited them from acting in bad faith, including by consciously disregarding a known duty to act. The duty of care required them to inform themselves of all material information reasonably

available before disposing of the Debtor's assets and to refrain from grossly negligent decision-making. The Director and Officer Defendants are not entitled to the protection of the business judgment rule because they were interested in, and lacked independence with respect to, the transactions challenged herein, and because those transactions were not approved by any disinterested decision-maker on behalf of the Debtor.

131. Fisk breached his fiduciary duties to the Debtor by, among other things:

(a) orchestrating, implementing, and concealing the BNS Transfers, by which substantially all of the Debtor's operating assets were transferred to an entity controlled by Fisk for no consideration;

(b) diverting to BNS the Grant Transfers and the other business opportunities of the Debtor;

(c) causing the Debtor to supply its workforce and services to BNS at cost and without margin for years, and to donate $1.8 million to BNS between 2018 and 2022, including more than $1,000,000 in 2020 and 2021 when the Debtor's books reported negative operating income;

(d) disclosing, in 2023, that BNS was contemplating withdrawing its distribution of the Debtor's only product and hiring away the Debtor's workforce, and then causing BNS to do exactly that in 2024, without disclosing it to the Debtor's Board or members and without seeking any consideration for the Debtor;

(e) causing the Debtor's independent valuation to be halted, in disregard of the Side Letter, and withholding BNS's financial information so that the value of the Debtor's business would not be established;

(f) causing the Debtor to pay Fisk $240,500 in guaranteed payments, and to make distributions to Fisk, while the Debtor was insolvent and unable to pay its obligations to its members and creditors;

(g) placing Rachel Fisk on the Debtor's payroll to perform work "the vast majority" of which was for BNS;

(h) usurping control of the Board through the December 2023 Consent and the March 2024 amendment in violation of Sections 6.1, 11.2, and 13.1(p) of the LLC Agreement, and then acting as a one-person Board to authorize the Chapter 7 filing;

(i) closing fifteen of the Debtor's accounts in the eight weeks before the Petition Date without accounting for the funds therein; and

(j) causing the Debtor to file schedules and a Statement of Financial Affairs under penalty of perjury that omitted BNS, the BNS Transfers, the Fisk Payments from the answer to Question 4, the Fisk Distributions, Apamante, the Debtor's subsidiaries, and the Debtor's causes of action.

132. Hayes breached her duties by performing, at Fisk's direction, the discretionary allocations of personnel time, compensation, and server costs by which value was shifted from the Debtor to BNS; by keeping both entities' books in a manner that concealed the intercompany transfers; and by failing to preserve and turn over the Debtor's records.

133. Aiken breached his duties by consciously permitting Fisk, from December 2023 forward, to transfer the Debtor's business to BNS without Board deliberation, disinterested approval, or consideration to the Debtor; by failing to inform himself of, or to act upon, the transactions alleged herein; and by acquiescing in Fisk's purported action as a one-person Board to authorize the Chapter 7 filing.

134. The conduct of the Director and Officer Defendants was not undertaken in good faith or pursuant to authority granted by the LLC Agreement, and constituted intentional misconduct, recklessness, bad faith, and willful misconduct within the meaning of Sections 8.1(a) and 8.1(b) of the LLC Agreement.

135. As a direct and proximate result of the breaches of fiduciary duty by the Director and Officer Defendants, the Debtor has suffered damages in an amount to be determined at trial, which the Trustee believes substantially exceeds $20,000,000, and the Director and Officer Defendants are jointly and severally liable therefor. Fisk should further be required to disgorge all compensation, distributions, and other benefits received from the Debtor and from BNS during the period of his disloyalty.

**TENTH CLAIM — AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against BNS, Rachel Fisk, Hayes, Frech, and Wegmann)**

136. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

137. Fisk and the other Director and Officer Defendants owed and breached fiduciary duties to the Debtor as alleged above.

138. BNS knowingly participated in those breaches. BNS acted at all times through Fisk, its President and Executive Director, whose knowledge of his own breaches is imputed to BNS. BNS was the vehicle and the beneficiary of every breach alleged herein: it received the Debtor's grants, workforce, domain names, accounts, subscribers, code, and revenue, and it did so with full knowledge (because Fisk had signed the APA for BNS) that those assets belonged to the Debtor and that BNS had covenanted never to use or benefit from them. BNS also created the informational vacuum that enabled the breaches by refusing, "as directed by the other board members of BNS," to provide its financial information to the Debtor's valuation firm.

139. Rachel Fisk, Hayes, Frech, and Wegmann each knowingly participated in and substantially assisted the breaches: Rachel Fisk by accepting compensation from the Debtor for work performed for BNS and by serving as an officer of the Debtor while the transfers were carried out; Hayes by performing the allocations and keeping the books through which intercompany transfers were effected; and Frech and Wegmann by, upon information and belief, transferring the Debtor's code repositories, accounts, infrastructure, and product development to BNS, by migrating their own services and those of the Debtor's engineering staff to BNS, by participating in the establishment of undisclosed entities and banking channels, and, as to Frech, by signing the December 2023 Consent by which Fisk seized control of the Board. Each of them knew that Fisk controlled both entities, that the Debtor received nothing for what BNS took, and that the Debtor's co-founder had objected in writing that the diversion of the Debtor's business to BNS was a breach of fiduciary duty.

140. To the extent any Defendant is found not to have owed fiduciary duties to the Debtor at the time of the transactions complained of, such Defendant is nevertheless liable for having aided and abetted the breaches of fiduciary duty by the Defendants who did.

141. As a direct and proximate result of this conduct, the Debtor has suffered damages in an amount to be determined at trial, which the Trustee believes substantially exceeds $20,000,000, for which the Defendants named in this Claim are jointly and severally liable with the Director and Officer Defendants.

**ELEVENTH CLAIM — CORPORATE WASTE**
**(Against Fisk and Aiken)**

142. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

143. The BNS Transfers had no rational business purpose from the standpoint of the Debtor and were so one-sided that no business person of ordinary, sound judgment could conclude that the Debtor received adequate consideration for them. The Debtor gave up its entire operating business, its workforce, its distribution channel, and its funding, and received nothing.

144. Fisk, as the Manager who caused the BNS Transfers, and Aiken, as the Manager who permitted them, are liable to the Debtor for the waste of its assets in an amount to be determined at trial.

**TWELFTH CLAIM — RECOVERY OF UNLAWFUL DISTRIBUTIONS**
**Pursuant to 6 Del. C. § 18-607**
**(Against Fisk)**

145. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

146. Upon information and belief, within three years before the commencement of this action the Debtor made distributions to Fisk, including the Fisk Distributions and, to the extent they are characterized as distributions, the Fisk Payments, at times when, after giving effect to such distributions, all liabilities of the Debtor exceeded the fair value of its assets.

147. Fisk, as the member who received such distributions and — as the Manager who caused them — the person with the most complete knowledge of the Debtor's financial condition, knew at the time of each such distribution that it violated 6 Del. C. § 18-607(a).

148. Accordingly, pursuant to 6 Del. C. § 18-607(b), Fisk, as a member who knowingly received such distributions, is liable to the Debtor for the amount of each such distribution, and the Trustee is entitled to judgment against Fisk in that amount, to be determined at trial.

**THIRTEENTH CLAIM — BREACH OF CONTRACT**
**(Asset Purchase Agreement and Intellectual Property Assignment Agreement)**
**(Against BNS)**

149. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

150. The APA and the IP Assignment are valid and binding contracts between the Debtor and BNS. The Debtor performed all of its obligations thereunder, including payment of the full $404,719 purchase price.

151. BNS breached the APA and the IP Assignment by, among other things: (a) using and receiving the benefit of the Purchased Assets, including the "Lantern" mark, the lantern.io and getlantern.org domains, the server and cloud accounts, the getlantern GitHub organization, and the End User Data, in violation of Section 2.6(f); (b) using and disclosing the Debtor's non-public information relating to the Purchased Assets and Lantern, including subscriber and user data, in violation of Section 4.2; (c) competing with, and assisting others to compete with, the Debtor's use of the Purchased Assets before March 12, 2024, including by planning and preparing to replace Lantern Pro and to hire the Debtor's workforce, in violation of Section 4.5; (d) failing to transfer to the Debtor, without additional consideration, after-discovered assets that should have been Purchased Assets, in violation of Section 4.1(b); and (e) failing to honor the Debtor's perpetual, irrevocable license to all closed-source software created by or for BNS under Section 4.6.

152. As a direct and proximate result of BNS's breaches, the Debtor has suffered damages in an amount to be determined at trial. Pursuant to Section 6.7 of the APA, the Trustee, as the prevailing party, is entitled to recover his reasonable attorneys' fees and costs, and pursuant to Section 6.13, the Trustee is entitled to specific performance and injunctive relief compelling BNS to cease using the Purchased Assets and to convey to the Trustee all after-discovered assets.

**FOURTEENTH CLAIM — UNJUST ENRICHMENT**
**(Against BNS, Fisk, Rachel Fisk, Frech, Wegmann)**

153. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

154. BNS has been enriched by its receipt and use of the Lantern Assets, the Grant Transfers, the Workforce Transfer, the Subscription Business Transfer, the Debtor's at-cost services and cash donations, and the revenues and grant proceeds derived therefrom. Fisk has been enriched by the Fisk Transfers and by the compensation he has drawn from BNS out of the proceeds of the Debtor's business. Rachel Fisk, Frech, and Wegmann have been enriched by the compensation, fees, and other value they have received from BNS and from Fisk out of those proceeds.

155. The Debtor has been correspondingly impoverished; the enrichment and impoverishment are directly related; there is no justification for the enrichment; and, as to the Defendants named in this Claim other than as governed by the APA, there is no adequate remedy at law. This Claim is pleaded in the alternative to the extent any express contract is found to govern.

156. The Defendants named in this Claim should be required to disgorge to the Trustee, and the Trustee is entitled to restitution of, all amounts by which they have been unjustly enriched, in an amount to be determined at trial, and a constructive trust should be imposed for the benefit of the estate upon the Lantern Assets and all proceeds thereof in their possession.

**FIFTEENTH CLAIM — CIVIL CONSPIRACY**
**(Against Fisk, BNS, Rachel Fisk, Aiken, Hayes, Frech, and Wegmann)**

157. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

158. Fisk, BNS, Rachel Fisk, Aiken, Hayes, Frech, and Wegmann knowingly and intentionally combined and agreed among themselves to accomplish the unlawful objectives alleged herein, including the transfer of the Debtor's business to BNS without consideration, the diversion of the Debtor's grants and opportunities, the seizure of control of the Debtor's Board, the concealment of the transfers from the Debtor's members and creditors and from the Bankruptcy Court, and the continued exploitation of the estate's property after the Petition Date.

159. Each of the Defendants named in this Claim committed one or more unlawful acts in furtherance of the conspiracy, including the breaches of fiduciary duty, fraudulent transfers, and other wrongs alleged herein, and the Debtor suffered actual damage as a result.

160. Each of the Defendants named in this Claim is therefore jointly and severally liable for all damages caused by the acts of any co-conspirator in furtherance of the conspiracy, in an amount to be determined at trial.

**SIXTEENTH CLAIM — DECLARATORY JUDGMENT**
**Pursuant to 28 U.S.C. § 2201 and 11 U.S.C. § 541**
**(Against BNS, Fisk, Apamante)**

161. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

162. An actual and justiciable controversy exists between the Trustee, on the one hand, and BNS, Fisk, and Apamante, on the other, concerning the ownership of the Lantern Assets and of the assets held by Apamante, and the liability of BNS for the obligations of the Debtor.

163. Based on the facts set forth above, the Trustee is entitled to a declaratory judgment (the "Declaratory Judgment") to the effect that:

(a) the Lantern Assets, as defined above, including the "Lantern" marks, the domain names, the server, cloud, developer, and payment-processor accounts, the

getlantern GitHub organization, the Proprietary Code, the End User Data, the Lantern Pro subscriber relationships, and all Yinbi tokens and other assets held by or for the Debtor through Apamante or any other entity, are property of the estate under 11 U.S.C. § 541(a), free and clear of any interest of BNS, Fisk, or Apamante;

(b) BNS is the successor to the Debtor with respect to the Lantern business under the de facto merger, mere continuation, and fraudulent-transaction exceptions to the rule of non-liability of asset purchasers, and is liable for all of the debts and obligations of the Debtor;

(c) BNS, with respect to the Lantern business, is the alter ego of the Debtor, in that the Debtor and BNS were operated as a single enterprise under common control without regard to their separate existence, with commingled personnel, funds, and assets, and BNS was used as an instrumentality to strip the Debtor of its assets and to defeat the claims of the Debtor's creditors, such that the separate existence of BNS should be disregarded and BNS held liable for the Debtor's obligations to the extent of the value received;

(d) Apamante is wholly owned or controlled by the Debtor, and its assets are property of the estate or held in trust for the estate; and

(e) BNS has no right, license, or consent to use any of the Lantern Assets.

**SEVENTEENTH CLAIM — EQUITABLE SUBORDINATION AND DISALLOWANCE OF CLAIMS**
**Pursuant to 11 U.S.C. §§ 510(c) and 502(d)**
**(Against Fisk, Frech, and BNS)**

164. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

165. Fisk (Claim No. 2, $124,190) and Frech (Claim No. 3, $9,149) have filed proofs of claim against the estate, and BNS may assert or hold claims against the estate, including claims under the APA or on account of intercompany charges.

166. Fisk, Frech, and BNS are insiders of the Debtor who engaged in the inequitable conduct alleged herein. That misconduct injured the Debtor's creditors and conferred an unfair advantage on Fisk, Frech, and BNS. Equitable subordination of their claims is not inconsistent with the provisions of the Bankruptcy Code.

167. Accordingly, pursuant to 11 U.S.C. § 510(c), any and all claims of Fisk, Frech, and BNS against the Debtor should be subordinated to the claims of all other creditors of the Debtor, and any lien securing such claims should be transferred to the estate.

168. In addition, pursuant to 11 U.S.C. § 502(d), any and all claims of Fisk, Frech, and BNS must be disallowed unless and until each has paid the amounts, or turned over the property, for which he or it is liable under 11 U.S.C. §§ 542 and 550.

**EIGHTEENTH CLAIM — ACCOUNTING**
**(Against BNS, Fisk, Hayes, and Apamante)**

169. The preceding paragraphs are incorporated herein by reference as if restated in their entirety.

170. BNS, Fisk, Hayes, and Apamante have been in exclusive possession and control of the books, records, accounts, and intercompany allocations of the Debtor and BNS, the records of the Debtor's subsidiaries and of Apamante, and the records of the revenue, grant proceeds, and other value generated by the Lantern Assets since the BNS Transfers. By reason of the fiduciary relationship between the Director and Officer Defendants and the Debtor, and the complexity and concealment of the intercompany transactions, the full amounts owed to the estate cannot be ascertained without an accounting.

171. The Trustee is entitled to a full and complete accounting from BNS, Fisk, Hayes, and Apamante of (a) all transfers of money, property, personnel, or services between the Debtor and BNS from January 1, 2018 to the present; (b) all grant applications, awards, and receipts relating to Lantern from January 1, 2021 to the present, and the entity in whose name each was made; (c) all revenue, payouts, and proceeds derived from the Lantern Assets from January 1, 2024 to the present; (d) the disposition of the funds in each of the fifteen accounts closed between August 16 and September 23, 2024; and (e) all Yinbi tokens and other cryptocurrency held by or for the Debtor or Apamante, and the disposition thereof.

## VI. RELIEF REQUESTED

WHEREFORE, Plaintiff Alfred T. Giuliano, Chapter 7 Trustee of the estate of Innovate Labs LLC, demands judgment in his favor and against the Defendants, jointly and severally where appropriate, for:

(a) Avoidance of the BNS Transfers, the Fisk Transfers, the Preference Transfers, and the Post-Petition Transfers pursuant to 11 U.S.C. §§ 544, 547, 548, and 549 and 6 Del. C. §§ 1304 and 1305, and preservation of the avoided transfers for the benefit of the estate pursuant to 11 U.S.C. § 551;

(b) Recovery from BNS, Fisk, and Frech, pursuant to 11 U.S.C. § 550, of the property transferred or the value thereof, including judgment against BNS for the value of the Lantern business and all revenues and profits derived therefrom;

(c) Turnover and accounting of the Lantern Assets and all proceeds thereof, and turnover of the Debtor's books and records, pursuant to 11 U.S.C. § 542;

(d) A declaration that the Post-Petition Transfers and all other acts in violation of the automatic stay are void, an injunction prohibiting BNS and Fisk from further

exercising control over property of the estate, and damages, disgorgement, and attorneys' fees and costs for the willful violation of the automatic stay pursuant to 11 U.S.C. §§ 362 and 105(a);

(e) Judgment in favor of the Trustee and against the Director and Officer Defendants, BNS, Frech, and Wegmann, jointly and severally as set forth in the Ninth, Tenth, and Fifteenth Claims, for damages in an amount to be determined at trial but which substantially exceeds Twenty Million Dollars ($20,000,000);

(f) Disgorgement of all compensation, distributions, and benefits Fisk received during the period of his disloyalty;

(g) Judgment in favor of the Trustee and against Fisk pursuant to 6 Del. C. § 18-607 for the amount of all unlawful distributions, to be determined at trial;

(h) Judgment in favor of the Trustee and against Fisk and Aiken for the waste of the Debtor's assets, in an amount to be determined at trial;

(i) Judgment in favor of the Trustee and against BNS for breach of the APA and IP Assignment, including damages, specific performance, injunctive relief, and attorneys' fees and costs pursuant to Sections 6.7 and 6.13 of the APA;

(j) Restitution and disgorgement from BNS, Fisk, Rachel Fisk, Frech, and Wegmann of all amounts by which they have been unjustly enriched, and the imposition of a constructive trust for the benefit of the estate upon the Lantern Assets and all proceeds thereof;

(k) The Declaratory Judgment;

(l) Equitable subordination and disallowance of all claims of Fisk, Frech, and BNS against the estate;

(m) A full and complete accounting from BNS, Fisk, Hayes, and Apamante as set forth in the Eighteenth Claim;

(n) Punitive damages against the Defendants found liable on the Ninth, Tenth, and Fifteenth Claims, jointly and severally;

(o) Pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs; and

(p) Such other and further relief as this Court deems just and proper.

## VII. JURY DEMAND

The Trustee demands a jury trial before an Article III Judge on all claims asserted in this Complaint that are triable to a jury under the Constitution and applicable law.

Dated: October 7, 2026
Wilmington, Delaware

**FOX ROTHSCHILD LLP**

*/s/ Seth A. Niederman*
Seth A. Niederman (No. 4588)
1201 N. Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
sniederman@foxrothschild.com

– and –

**COREN & RESS, P.C.**
Steven M. Coren (pro hac vice forthcoming)
Benjamin M. Mather (pro hac vice forthcoming)
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 735-8700

Special Counsel for Plaintiff Alfred T. Giuliano, Chapter 7 Trustee of the Estate of Innovate Labs LLC